Lloyd RASMUSSEN, Claimant
and Appellant,

v.

**SOUTH DAKOTA DEPARTMENT OF
LABOR, Defendant and Appellee,**

and

**H & I Grain and Leasing, Employer
and Appellee.**

No. 18304.

Supreme Court of South Dakota.

Considered on Briefs Sept. 3, 1993.

Decided Dec. 29, 1993.

Eric N. Rasmussen of Erickson, Helsper &
Rasmussen, Brookings, for claimant and appellant.

Ronald A. Wager of Bantz, Gosch, Cremer,
Peterson & Oliver, Aberdeen, for employer
and appellee H & I.

Drew C. Johnson, Sp. Asst. Atty. Gen.,
Aberdeen, for defendant and appellee State.

SABERS, Justice.

Lloyd Rasmussen (Rasmussen) appeals the
circuit court's affirmance of the South Dakota Department of Labor's denial of his claim

for unemployment insurance benefits. We reverse.

### FACTS

Rasmussen was employed as a truck driver by H & I Grain and Leasing (H & I) for a little over four years. On or about December 12, 1991, Rasmussen was convicted of the offense of driving while under the influence of alcohol (DUI). According to the employer's hearing testimony, this was Rasmussen's second DUI conviction in a two or three year period. Because of the conviction, Rasmussen's driver's license was suspended for one year. However, Rasmussen was granted a work permit so that he could continue working and H & I did allow Rasmussen to continue driving trucks with his work permit.

As a result of new federal regulations, all commercial truck drivers must now possess a commercial driver's license (CDL).[1] Those regulations took effect on April 1, 1992, during the period of the suspension of Rasmussen's driver's license. Rasmussen learned that he could not obtain a CDL because of the suspension and that he would not be able to qualify for a CDL until he obtained his driver's license after expiration of the period of suspension. Because Rasmussen could not obtain a CDL, H & I could not allow him to continue working as a truck driver. Therefore, Rasmussen's last day of employment as a truck driver was on March 31, 1992.

H & I offered Rasmussen continued employment operating a grinder. Therefore, after Rasmussen finished his work as a truck driver and took a few days off, he returned to work for H & I as a grinder operator. However, because of difficulties Rasmussen experienced with operating the grinder, he worked for only a few more days before finally leaving his employment with H & I.

Rasmussen filed his claim for unemployment insurance benefits on May 29, 1992, and his claim was denied. After an inter-departmental appeal and evidentiary hearing as well as an appeal to the Secretary of Labor, the Department of Labor denied Rasmussen's claim for benefits on the basis that he was discharged from his employment for work-connected misconduct.

Rasmussen appealed the final decision of the Department of Labor to the circuit court on September 14, 1992. On March 2, 1993, the circuit court entered its judgment and order affirming the department's denial of benefits and adopting the department's findings of fact and conclusions of law. Rasmussen appeals.

### ISSUE 1

WAS RASMUSSEN DISCHARGED FROM HIS EMPLOYMENT FOR MISCONDUCT THAT DISQUALIFIES HIM FROM RECEIVING UNEMPLOYMENT INSURANCE BENEFITS?

The unemployment insurance law provides for a disqualification from the receipt of unemployment insurance benefits for individuals discharged from their employment for misconduct connected with their work. The pertinent statute is SDCL 61–6–14 which provides in part:

> An unemployed individual who was discharged or suspended from his most recent employment ... *for misconduct connected with his work* shall be denied benefits until he has been reemployed at least six calendar weeks in insured employment during his current benefit year and earned wages of not less than his weekly benefit amount in each of those six weeks. (emphasis added).

"Misconduct" is statutorily defined at SDCL 61–6–14.1:

> As used in this chapter, misconduct is:
>
> (1) Failure to obey orders, rules or instructions, or failure to discharge the duties for which an individual was employed; or
>
> (2) Substantial disregard of the employer's interests or of the employee's duties and obligations to his employer; or
>
> (3) Conduct evincing such willful or wanton disregard of an employer's inter-

---

1. There is no dispute between the parties concerning the commercial driver's license requirements and, therefore, for purposes of this decision, it is presumed that the parties have accurately represented those requirements.

ests as is found in deliberate violations or disregard of standards of behavior which the employer has the right to expect of his employee; or

    (4) Carelessness or negligence of such degree or recurrence as to manifest equal culpability or wrongful intent.

However, mere inefficiency, unsatisfactory conduct, failure to perform as the result of inability or incapacity, a good faith error in judgment or discretion, or conduct mandated by a religious belief which belief cannot be reasonably accommodated by the employer is not misconduct.

Rasmussen contends that the Department of Labor and circuit court erred as a matter of law in holding that his discharge for off-duty conduct (i.e., his DUI) was a discharge for work-connected misconduct that disqualifies him from receiving unemployment insurance benefits. He argues that for his employer to have prevailed on such a claim, it was incumbent for his employer to show that he committed his DUI with the specific knowledge that the employer's interests would suffer. Rasmussen asserts that it was impossible for H & I to make such a showing in this case because, in August of 1991, when he committed his DUI offense, it was impossible for him to know that his employer's interests would suffer because the DUI would eventually disqualify him from receiving a CDL.

■ In unemployment insurance appeals, "[w]hen the issue is a question of law, the decisions of the administrative agency and the circuit court are fully reviewable. When the issue is a question of fact, we ascertain whether the administrative agency was clearly erroneous." *Matter of Kotrba*, 418 N.W.2d 313, 314–15 (S.D.1988). Whether an individual has been discharged from his employment for misconduct that disqualifies him from receiving unemployment insurance benefits is a question of law and is, therefore, fully reviewable by this Court. *See, Kotrba, supra. See also, Markel v. City of Circle Pines*, 479 N.W.2d 382 (Minn.1992).

In *Kotrba, supra*, this Court set forth the test for determining whether off-duty conduct resulting in loss of employment constitutes work-connected misconduct disqualify-ing an individual from receiving unemployment insurance benefits.

> [I]n order to establish misconduct connected with an employee's work as required by [statute] the employer must show by a preponderance of the evidence that a reasonable person would find the employee's conduct: (1) had some nexus with the employee's work; (2) resulted in some harm to the employer's interests; and (3) was in fact conduct which was (a) violative of some code of behavior contracted for between employer and employee, and (b) done with intent or knowledge that the employer's interest would suffer.

*Kotrba*, 418 N.W.2d at 316 (quoting *Nelson v. Department of Employment Security*, 98 Wash.2d 370, 655 P.2d 242, 245 (1982)).

■ Applying this test in the instant case, Rasmussen was indisputably an employee whose ability to perform his job depended on his having a valid driver's license and obtaining a CDL. As a result, any conduct of Rasmussen's that jeopardized his driver's license and ability to obtain a CDL would have a nexus with his work by affecting his ability to perform his job. Rasmussen's voluntary conduct in driving drunk and putting at risk his driver's license and ability to obtain a CDL obviously harmed his employer's interest in retaining employees capable of performing the work they are hired to do. Because Rasmussen was specifically hired as a truck driver, it is apparent that, even in the absence of any express understanding, his employer was entitled to a legitimate expectation that Rasmussen would take all steps reasonable and necessary to maintenance and protection of his driving privileges and ability to perform his work as a truck driver.

It follows from the above that Rasmussen's voluntary conduct in driving drunk and jeopardizing his driving privileges was a knowing and substantial disregard of an obligation he owed his employer. Or, put in terms of the *Kotrba* test, it was conduct that violated a code of behavior contracted for between the employer and Rasmussen and was done with knowledge that the employer's interests would suffer. This is particularly true in view of the fact that Rasmussen had a prior

DUI conviction and must have understood the risk to his driving privileges he was undertaking by driving drunk. Moreover, the CDL requirements had been well known by the trucking industry for about two years.

Based upon the above analysis, despite the fact Rasmussen's DUI was off-duty conduct, it was, nevertheless, misconduct connected with his work as contemplated by the unemployment insurance law. His discharge for that misconduct would, therefore, disqualify him from the receipt of unemployment insurance benefits. Such was the similar conclusion of the Minnesota Supreme Court in *Markel, supra.* The unemployment insurance claimant in *Markel* was employed by a municipality. His job duties required driving the city's vehicles. The claimant was convicted of a DUI committed in his off-duty hours and was ultimately dismissed from his employment. In determining whether the claimant's dismissal was for work-connected misconduct that should disqualify him from the receipt of unemployment insurance benefits, the Minnesota Supreme Court concluded:

> We ... hold that conduct which results in the loss of a license necessary for the performance of normal job duties is misconduct, within the meaning of [*Tilseth v. Midwest Lumber Co.,* 295 Minn. 372, 204 N.W.2d 644 (1973) [2]]. As an employee whose ability to perform his job depended on his having a valid driver's license, Markel's behavior—drinking and driving—simply does not come within the *Tilseth* exceptions for inadvertence, negligence or errors in judgment. While some unintentional circumstances which lead to loss of a necessary occupational license might be treated differently, Markel's conduct in driving drunk, thus putting at risk his ability to drive his employer's vehicles due to loss of his driver's license, is misconduct under *Tilseth,* because it showed an intentional and substantial disregard of his duties and obligations to his employer. This is particularly true where Markel had previously lost his ability to drive because of alcohol related violations of the law, and thus necessarily must have understood the risk which he was taking. These circumstances satisfy the statutory requirement of misconduct and the definition of misconduct under *Tilseth.*

*Markel,* 479 N.W.2d at 385 (footnote added). In support of its conclusion, the Minnesota court cited *Look v. Maine Unemployment Ins. Comm'n,* 502 A.2d 1033 (Me.1985) and *Grimble v. Brown,* 247 La. 376, 171 So.2d 653 (1965) as also reflecting the proposition that, "[a] professional driver who is dismissed after revocation of his or her driver's license due to driving while under the influence of alcohol, while off-duty, is dismissed for misconduct." *Markel,* 479 N.W.2d at 385.

Rasmussen cites *Przekaza v. Dept. of Employment Sec.,* 136 Vt. 355, 392 A.2d 421 (1978) as support for his position that his off-duty DUI should not constitute disqualifying misconduct for purposes of his receipt of unemployment insurance benefits. In *Przekaza,* the claimant, like Rasmussen, was employed as a driver and received an off-duty DUI that ultimately resulted in the revocation of his driver's license. Unlike Rasmussen, however, the claimant in *Przekaza* signed a letter of resignation at his employer's behest. Thus, the claimant was disqualified from receiving unemployment insurance benefits because he voluntarily left his employment without good cause. In its review, the Vermont Supreme Court held:

> The record is devoid of any evidence that the [claimant] intended to quit his job. On the contrary, the facts establish that the [claimant] was discharged when the revocation of his license made it impossible for him to perform his job as a driver. The facts as found below do not support the result reached by the Board but compel a different result as a matter of law. The decision of the Board based on an erroneous conclusion of law must, therefore, be reversed.

*Przekaza,* 392 A.2d at 422–23 (citations omitted). This passage makes clear that the Vermont court never specifically considered

---

**2.** *Tilseth* defined "misconduct" for purposes of the unemployment insurance law in terms nearly identical to those utilized by this court in *Matter* of *Yaroch,* 333 N.W.2d 448 (S.D.1983) and now codified at SDCL 61–6–14.1.

the issue presented in this case, i.e., whether a discharge from employment for an off-duty DUI can constitute a discharge for work-connected misconduct that should disqualify the employee from receiving unemployment insurance benefits. For that reason, *Przekaza* is unpersuasive authority in this instance.

Based upon the foregoing analysis, we hold that *if* Rasmussen was discharged from his employment for his off-duty DUI and consequent inability to obtain a CDL, the discharge was for work-connected misconduct that should disqualify him from receiving unemployment insurance benefits. We find no error of law by the Department of Labor or circuit court in reaching this same conclusion.

## ISSUE 2

WHETHER THE DEPARTMENT OF LABOR WAS CLEARLY ERRONEOUS IN ITS FINDING CONCERNING THE REASON RASMUSSEN WAS DISCHARGED FROM HIS EMPLOYMENT?

■ In her finding of fact VII, the hearings officer for the Department of Labor found that, "[w]hen [Rasmussen] could not obtain a CDL, the Employer could not allow [Rasmussen] to continue to work as a truck driver." As his second issue, Rasmussen essentially challenges the accuracy of the finding that he was discharged for his DUI and inability to obtain a CDL. In that regard, Rasmussen points out that, after he could no longer drive a truck, H & I offered him continued employment operating a grinder. He asserts that it was his inability to operate the grinder rather than his inability to obtain a CDL that ultimately led to his separation from employment. Rasmussen submits that a discharge under these circumstances is not a discharge for work-connected misconduct that disqualifies him from receiving unemployment insurance benefits. We agree.

In unemployment insurance appeals where the issue is a question of fact, this Court must ascertain whether the administrative agency was clearly erroneous. *Kotrba, supra.* "A finding is 'clearly erroneous' when after reviewing all of the evidence, we are left with a definite and firm conviction that a mistake was made." *Selle v. Pierce,* 494 N.W.2d 634, 636 (S.D.1993). Here, we find that such a mistake was made.

■ In reviewing an individual's eligibility for unemployment insurance benefits and considering the reasons for the claimant's separation from his employment, this Court has looked to the causal connection between the claimant's act and the loss of employment. In *S.D. Stockgrowers Ass'n v. Holloway,* 438 N.W.2d 561 (S.D.1989), the claimant resigned from his employment in April 1987 but the resignation was not acted on or accepted and the employment was later continued on an "at will" basis. The claimant continued working until the following September when he was advised that he had been replaced. However, the employer did ask the claimant to stay on until the following month to train his replacement. The claimant refused and left the employment at the end of September. The claimant's unemployment insurance claim was granted on the basis that he was discharged under nondisqualifying circumstances. In a later appeal to this Court, the employer contended that the claimant was not discharged but voluntarily quit his employment. In support of that contention, the employer strongly relied on the claimant's April 1987 resignation. This Court rejected that argument observing:

> [B]oth the hearings examiner and the circuit court focused on the events of September 23, 1987, *as actually precipitating [the claimant's] separation.* Both the hearings examiner and the circuit court found that [the claimant's] choice to resign rather than to continue his employment until his termination date of October 15 constituted a discharge rather than a voluntary quit under the unemployment insurance law. Thus the central issue is whether quitting employment after notice of discharge but prior to the effective date of the discharge is a discharge or a voluntary quit under the unemployment insurance law.

*Stockgrowers,* 438 N.W.2d at 562–63 (emphasis added) (footnote omitted).

The record in this case makes clear that the event "actually precipitating" Rasmussen's separation from employment was not

his DUI, his inability to obtain a CDL or his inability to drive a truck. Rather, after Rasmussen could no longer drive a truck, he was offered continued employment operating a grinder. The employer's testimony in that regard was as follows:

> I felt that if [Rasmussen] could run a grinder down there that we have here at Hetlin, it would be a chance for him *to continue having employment* and having some work come in and we tried for about a week there on the grinder and it just didn't seem to work. The minute that we had to go home or leave him down there by himself, ah, the machinery would plug up. I'd no more and get home and sit down for supper and I'd have to run back in and it just looked like to me that it wasn't going to work at all and the last time when it plugged it up very seriously we had a chance of having a serious fire plus burning out a $10,000 motor and I just made up my mind that this, this wasn't going to work. *I told him when he no longer could drive the truck that we would try it, if it worked fine, if it didn't why he'd just have to do something else. That's the only thing that I have at my place here that he could work at without a CDL.* (emphasis added).

This testimony establishes that it was Rasmussen's inability to run the grinder rather than his inability to drive a truck that ultimately led to the loss of his employment. Even H & I's brief concedes that, "[h]ad [Rasmussen] been able to operate the hay grinder he probably would have continued employment with H & I Grain." Since there is no allegation or argument that there was any misconduct involved in Rasmussen's operation of the grinder and his difficulties with the grinder were attributed to his inability, we hold that Rasmussen's discharge falls within the following category defined by SDCL 61–6–14.1:

> [M]ere inefficiency, unsatisfactory conduct, *failure to perform as the result of inability or incapacity,* a good faith error in judgment or discretion, or conduct mandated by a religious belief which belief cannot be reasonably accommodated by the employer *is not misconduct.* (emphasis added).

It follows from the above that Rasmussen's discharge was under nondisqualifying circumstances for purposes of his receipt of unemployment insurance.

Reversed.

MILLER, C.J., and AMUNDSON, J., concur.

WUEST and HENDERSON, JJ., dissent.

WUEST, Justice (dissenting).

I do not agree with the majority opinion. Rasmussen lost his job because he did not have a commercial driver's license. It is that simple. I would affirm in all respects.

HENDERSON, Justice (dissenting).

Under *Matter of Yaroch,* 333 N.W.2d 448 (S.D.1983) and *Markel v. City of Circle Pines,* 479 N.W.2d 382 (Minn.1992), the decision of the administrative law judge, the affirmance thereof by the Secretary for the Department of Labor and the circuit court should be affirmed. In *Markel,* 479 N.W.2d at 384, a definition for misconduct was adopted from *Tilseth v. Midwest Lumber Co.,* 204 N.W.2d 644, 646 (Minn.1973). It is apparent that the definition of misconduct is identical to the misconduct definition established by the Supreme Court of this state in *Yaroch,* 333 N.W.2d at 449. This definition was later codified at SDCL 61–6–14.1.

Here, Rasmussen's second conviction for DUI serves as a nexus to disqualify him from unemployment insurance benefits. Rasmussen was hired to drive trucks for the appellee, H & I Grain and Leasing. Rasmussen's second DUI precluded him from fulfilling his duties. Granted, it was off-duty misconduct, but nevertheless it prevented him from driving a truck for his employer. Losing his driver's license was not an unforeseen consequence of a second drunken driving conviction.

In my opinion, H & I Grain should not be penalized for attempting other options for Rasmussen. This Court should not adopt a policy of law which would discourage employers from attempting in a cooperative manner to work with employees to secure a different type of employment within that particular

business. It is akin to punishing kindness. It is like "no good deed should go unpunished." Were we to adopt the reasoning of the majority opinion, Rasmussen, and others similarly situated, would have a right to be rehabilitated on job A, then if job A could not be accomplished by a claimant, claimant is entitled to job B; by extension of logic, the claimant could, and the employer would be required, to go through the alphabet.

Rasmussen placed himself in peril of his employment by his misconduct under SDCL 61–6–14.1. The precipitating force for his disemployment was his second DUI, it was not his inability to operate a grinder. Testimony of Duane Steffensen, manager for H & I Grain, discloses at page 6 of the transcript:

Q I'm wondering if there's anything that you'd like to tell me about concerning his separation from employment sir?

A Ah, the only thing that I, I felt that if Lloyd could could [sic] run a grinder down there that we have here at Hetlin, it would be a chance for him to continue having employment and having some work come in and we tried for about a week there on the grinder and it just didn't seem to work....

At page 10 of the transcript, Rasmussen testified:

Q Okay. Is there anything else that you want to tell me about sir that I've not yet asked you about?

A Not that I can think of, no. I tried to work for Duane over there at the hay plant over there and I was not experienced in it, you know, and we just didn't come out right so that's about all I can say which *I don't think should have any bearing on this here CDL should it.* (emphasis supplied mine).

Correct. We should honor his own utterance.

Therefore, I respectfully dissent.